UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLINA HEALTH SERVICES, et al., )<br>          Plaintiffs, )<br> )<br>     v. )<br> )<br>SYLVIA M. BURWELL, Secretary )<br>United States Department of )<br>Health and Human Services, )<br> )<br>          Defendant. )<br> ) | Civil Action No. 14-1415 (GK) |

## MEMORANDUM OPINION

Plaintiffs Allina Health Services, et al. ("Plaintiffs") are nine hospitals that bring this action against Sylvia M. Burwell, in her official capacity as Secretary of the United States Department of Health and Human Services ("Secretary" or "Defendant"). They challenge the calculation of certain disproportionate share hospital payments as procedurally and substantively invalid.

This matter is before the Court on the Plaintiff's Motion for Summary Judgment [Dkt. No. 8] and Defendant's Cross-Motion for Summary Judgment [Dkt. No. 28]. Upon consideration of the Motions, Oppositions, Replies, the entire record herein, and for the reasons set forth below, Plaintiffs' Motion shall be **denied** and Defendant's Motion shall be **granted**.

## I.    Background

### A.    The Medicare DSH Payment System

The Medicare program was established in 1965 and provides health care coverage for persons age 65 and older, disabled persons, and persons with end stage renal disease who meet certain eligibility requirements. See 42 U.S.C. § 426, 426a. The Secretary administers the program through the Centers for Medicare & Medicaid Services (CMS), an agency with the United States Department of Health and Human Services. Def.'s Mot. at 4.

Medicare pays benefits through different plans, three of which are relevant here. "Plan A covers medical services furnished by hospitals and other institutional care providers." Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 2 (D.C.Cir.2011); 42 U.S.C. §§ 1395c to 1395i-5. "Part B is an optional supplemental insurance program that pays for medical items and services not covered by Part A, including outpatient physician services, clinical laboratory tests, and durable medical equipment." Ne. Hosp., 657 F.3d at 2; 42 U.S.C. §§ 1395j to 1395w-4. "Part C governs the 'Medicare + Choice' (M+C) program, which gives Medicare beneficiaries an alternative to the traditional Part A fee-for-service system," allowing enrollment in a managed care plan. Ne. Hosp., 657 F.3d at 2; see 42 U.S.C. §§ 1395w-21 to 1395w-29. The Secretary pays the health care provider directly under Parts A and B, but pays

the managed-care plan under Part C, which in turn pays the provider.

Hospitals that serve a significantly disproportionate share of low-income patients without private health insurance are paid "additional monies [by Medicare], on top of Medicare's normal fees-for-service, to help cover the costs associated with the care of the very poor." Allina Health Servs. v. Sebelius, 904 F. Supp. 2d 75, 77 (D.D.C. 2012) ("Allina I"); see also 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

The disproportionate share hospital ("DSH") adjustment is based on a "disproportionate patient percentage" for each hospital, which is determined by a complicated statutory formula. See 42 U.S.C. §§ 1395ww(d)(5)(F)(iv) and (vii)-(xiii); 42 C.F.R. § 412.106(d). The disproportionate patient percentage is the sum of two fractions, 42 U.S.C. § 1395ww(d)(5)(F)(vi), which are commonly known as the "Medicaid fraction" and the "Medicare fraction" (sometimes also referred to as the "SSI fraction").

The Medicare fraction is defined as:

the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of [Title XVIII] and were entitled to supplemental security income benefits (excluding any State supplementation)

3

under [Title] XVI of this chapter, and the denominator

of which is the number of such hospital's patient days

for such fiscal year which were made up of patients who

(for such days) were entitled to benefits under part A

of [Title XVIII]...

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added). In layman's

terms, the top of the Medicare fraction is based on the number of

a hospital's patient days for individuals entitled to both Medicare

Part A and SSI benefits, and the bottom of the fraction is based

on the number of patient days for all patients under Part A. As

discussed later, the phrase "entitled to benefits under part A" is

key to the present dispute.

The Medicaid fraction is defined as:

the fraction (expressed as a percentage), the numerator

of which is the number of the hospital's patient days

for such period which consist of patients who (for such

days) were eligible for medical assistance under a State

[Medicaid] plan ... but who were not entitled to benefits

under [Medicare] Part A ... and the denominator of which

is the total number of the hospital's patient days for

such period.

Id. § 1395ww(d)(5)(F)(vi)(II). In layman's terms, the top of

the Medicaid fraction is based on the number of a hospital's

patient days for individuals who are eligible for Medicaid, but

4

who are not entitled to benefits under Medicare Part A, and the bottom is the total number of all patient days for the hospital. For a visual representation of the fractions, see Ne. Hosp., 657 F.3d 1, 3.

M+C (also referred to as Part C) was established by Congress in 1997 as part of the Balanced Budget Act of 1997 (BBA), Pub. L. No. 105-33 (1997). In order to enroll in M+C, an individual must be "entitled to benefits under part A ... and enrolled under part B." 42 U.S.C. § 1395w-21(a)(3)(A). After M+C was implemented, "the Secretary routinely excluded M+C [inpatient hospital] days from the Medicare fraction" from 1999 to 2004. Ne. Hosp., 657 F.3d at 15. That is, M+C patients were not counted in the numerator of the Medicare fraction as part of the patients "entitled to benefits under Part A . . . and entitled to [SSI] benefits." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). It was not until 2007 that the Secretary began to collect the data needed to include M+C days in the Medicare/SSI fraction. Id.; see Change Request 5647, CMS Pub. 100-04, Transmittal No. 1331 (July 20, 2007).

Central to this case is whether, once enrolled in Part C, enrollees continue to be entitled to benefits under Part A. If the agency considers enrollees to be entitled to benefits under Part A, then they should be included in the Medicare fraction. If they are no longer entitled to benefits under Part A, because they are receiving benefits under Part C, then they should be excluded from

the Medicare fraction. The financial impact on the hospitals of this seemingly minor detail is in the hundreds of millions of dollars. See Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1105 (D.C. Cir. 2014) ("Allina I Appeal").

**B.   Factual Background**

In Allina I, a group of hospitals, including the Plaintiffs in the present case, challenged a 2004 rulemaking by the Secretary ("2004 Final Rule"). See 904 F. Supp. 2d at 77. The 2004 rulemaking adopted a policy whereby Part C patients were to be considered as "entitled to benefits under part A," and therefore counted in the numerator of the Medicare fraction. In November 2012, the Court (Collyer, J.) granted summary judgment for the plaintiffs, finding that the 2004 Final Rule was not a logical outgrowth of the proposed rule and therefore violated the procedural requirements of the Administrative Procedure Act ("APA"). See Allina I, 904 F. Supp. 2d at 89-90.

On appeal, our Court of Appeals affirmed the part of the Allina I Court's decision vacating the 2004 Final Rule. But, the Court of Appeals held that the Allina I Court erred when it directed the Secretary to calculate the DSH payments in a particular manner, rather than simply remanding. See Allina I Appeal, 746 F.3d 1102, 1111 (D.C. Cir. 2014). On remand, the Secretary addressed the issue of the appropriate DSH calculation methodology through an adjudication. The Administrator determined

6

that, prior to 2004, the regulation did not specify where the Part C enrollees should be counted in the DSH percentage. Allina I, Adm'r Dec. at 26 (Dec. 2, 2015) [Dkt. 28-2]. The Administrator further concluded that the better statutory interpretation is that Part C enrollees are "entitled to benefits under Part A" within the meaning of the DSH provisions, and therefore should be included in the Medicare fraction. Id. at 35-45.

**C.   Procedural Background**

Shortly after our Court of Appeals' decision in Allina I, the Secretary published calculations for federal fiscal year 2012 DSH payments ("2012 DSH Calculations").[1] See 2012 Part A/SSI Fraction Data File, available at http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Downloads/FY-2012-SSI-Ratios-for-web-posting.zip. Plaintiffs allege that the 2012 DSH Calculations are based on the 2004 Final Rule that was vacated. They also allege that the 2012 DSH Calculations are procedurally invalid and arbitrary and capricious. Compl. ¶¶ 46-52. Plaintiffs timely appealed the 2012 DSH Calculations to the Provider

---

[1] The present action is not considered part of the Allina I remand, because it concerns a later year. In 2013, the HHS adopted a legislative rule that interprets the statute to require Part C days in the Medicare fraction. 78 Fed. Reg. 50,496, 50,614 (Aug. 19, 2013) ("2013 Rulemaking"). The legislative rule only has prospective application, and therefore does not apply to this case or the Allina I remand. Id. at 50,620.

Reimbursement Review Board ("PRRB"), see Compl. ¶¶ 36-39, and requested that the PRRB grant expedited judicial review. Id. ¶ 41.

The PRRB is an independent administrative tribunal that resolves disputes regarding hospital reimbursement determinations by Medicare contractors or the Centers for Medicare & Medicaid Services ("CMS"). See 42 U.S.C. § 1395oo(a). The PRRB may resolve certain payment disputes without following low-level policy guidance, see 42 C.F.R. § 405.1867; however, it is bound by agency regulation and rulings, id., and cannot decide "question[s] of law or regulations." 42 U.S.C. § 1395oo(f)(1). Section 1395oo(f) gives providers "the right to obtain judicial review of any action . . . which involves a question of law or regulations . . . whenever the [PRRB] determines . . . that it is without the authority to decide the question." Id.

By letter dated August 13, 2014, the PRRB granted Plaintiffs' request for expedited judicial review, finding that "it is without the authority to decide the legal question of whether the regulation regarding the [2012 DSH Calculations] is valid and whether the Secretary's actions subsequent to the decision in Allina [I] are legal." Letter from the Provider Reimbursement Review Board to Stephanie Webster 6 (Aug. 13, 2014) [Dkt. No. 14-1] ("PRRB Decision").

On August 19, 2014, Plaintiffs filed their Complaint, pursuant to the PRRB's grant of expedited judicial review [Dkt.

No. 1]. Plaintiffs filed a Notice of Related Case on the same day [Dkt. No. 2]. Judge Collyer granted Defendant's objection to the related case designation on May 18, 2015, and the case was randomly reassigned to this Court. Minute Order dated May 18, 2015; Case Assignment [Dkt. No. 20].

On October 27, 2014, Defendant filed her Motion to Dismiss for Lack of Jurisdiction or in the Alternative for Voluntary Remand [Dkt. No. 15], arguing that the PRRB improvidently granted expedited judicial review, or in the alternative, for voluntary remand to allow the PRRB to adjudicate Plaintiffs' claims without consideration of the 2004 Final Rule. Motion to Dismiss at 2. The Court denied Defendant's Motion to Dismiss on October 29, 2015 [Dkt. No. 21].

Plaintiffs filed their present Motion for Summary Judgment on September 29, 2014 [Dkt. No. 8], prior to Defendant's response to the Complaint. On October 17, 2014, the Court (Collyer, J.) granted Defendant's Motion to hold in abeyance the Motion for Summary Judgment until the Motion to Dismiss was filed and decided. See October 17, 2014 Minute Order. After this Court denied Defendant's Motion to Dismiss, Defendant filed her Answer on November 12, 2015 [Dkt. No. 24], and her Cross-Motion for Summary Judgment ("Def.'s Mot.") on December 15, 2015 [Dkt. No. 29]. Plaintiffs filed their Opposition ("Opp'n") on January 14, 2016 [Dkt. No. 30] and Defendant filed her Reply ("Reply") on February 4, 2016 [Dkt.

No. 33]. On February 12, 2016, Plaintiffs filed a Motion for Leave to File a Sur-Reply [Dkt. No. 34], which Defendant opposed [Dkt. No. 35], and the Court denied on February 18, 2016 [Dkt. No. 36].

## II.   Legal Standard

### A.   Motion for Summary Judgment

Summary judgment will be granted when there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(a). Because this case involves a challenge to a final administrative decision, the Court's review on summary judgment is limited to the administrative record. Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 160 (D.C. Cir. 2003) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record").

"Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing Richards v. INS, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)). In reviewing agency action, the district court "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the Secretary's

[action] was factually flawed." Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993).

### B.    Requirements of the APA and Medicare Act

Under the APA and the Medicare Act, legislative rules - rules that have the "force and effect of law," Chrysler Corp. v. Brown, 441 U.S. 281, 302-303, (1979)) - are issued through notice-and-comment rulemaking, in which the Secretary must provide the public with adequate notice of a proposed rule and an opportunity to comment thereon. See 5 U.S.C. § 553(b)-(c) (APA); 42 U.S.C. § 1395hh(b)(1) (Medicare) ("[B]efore issuing in final form any regulation . . . the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon."). "Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Int'l Union, UMWA v. MSHA, 407 F.3d 1250, 1259 (D.C. Cir. 2005). The 2012 DSH Calculations were not issued through notice and comment rulemaking, although Plaintiffs argue that they should have been. Pls.' Mot. at 9; Pls.' Reply at 10.

Not all rules require notice-and-comment prior to issuance. Section 4(b)(A) of the APA provides that, unless another statute

11

states otherwise, the notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). "[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1204 (2015) (quoting Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 99 (1995)).

The D.C. Circuit had long held that, even though notice and comment was not necessary for new interpretive rules issued by an agency, notice and comment was nonetheless required when an agency changed its prior interpretation. Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579 (1997). Overturning Paralyzed Veterans and its subsequent line of cases, the Supreme Court recently held that an agency need not use notice-and-comment procedures "when it wishes to issue a new interpretation of a regulation that deviates significantly from one the agency has previously adopted." Perez, 135 S. Ct. 1199 at 1203.

The APA also allows a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Tourus Records, Inc. v. DEA, 259 F.3d 731, 736 (D.C. Cir. 2001). "The scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." S. Co. Servs., Inc. v. FCC, 313 F.3d 574, 579-80 (D.C. Cir. 2002); see also United States v. Paddack, 825 F.2d 504, 514 (D.C. Cir. 1987).

An agency satisfies the arbitrary and capricious standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); Lichoulas v. FERC, 606 F.3d 769, 775 (D.C. Cir. 2010). However, courts "do not defer to the agency's conclusory or unsupported suppositions." McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1186-87 (D.C. Cir. 2004).

## III. Analysis

### A. The Evidence Is Not Convincing that CMS Calculated the 2012 DSH Fractions Based on the Vacated 2004 Final Rule.

Plaintiffs argue that the Secretary improperly relied on the vacated 2004 Final Rule to formulate the 2012 DSH Calculations, Pls.' Mot. at 6-7, while Defendant counters that the 2012 DSH

Calculations were reached by CMS in reliance on the language of the disproportionate patient percentage statute itself. Def.'s Mot. at 9.

What is central to this dispute is the parties' disagreement as to the impact of the vacatur of the 2004 Final Rule. Defendant argues that "the agency was faced with an ambiguous direction from Congress" and that the pre-2004 version of the applicable regulation did not specify where Part C days should be counted. Id. at 10. Plaintiffs on the other hand argue that pre-2004, the agency had a policy of excluding Part C days from the Medicare fraction. Pls.' Reply at 4. In the alternative, Plaintiffs argue that even if there was not a policy or regulation excluding Part C days from the Medicare fraction, the agency had a prior practice of excluding the Part C days, which was reinstated after the vacatur of the 2004 Final Rule. Id. (citing Croplife Am. v. EPA, 329 F.3d 876, 880, 884-85 (D.C. Cir. 2003).

Defendant contends that there is no evidence to directly suggest that the 2012 DSH Calculations were based on the vacated 2004 Final Rule, rather than on CMS's interpretation of the statute. Def.'s Mot. at 10. Conversely, Plaintiff argues that there is no evidence to suggest that the Secretary did not rely on the vacated rule. The Secretary states that CMS "inevitably had to employ one of two possible interpretations of the statutory language," and the one it chose for the 2012 DSH Calculations

reflected CMS's best understanding of the statutory language itself. Def.'s Mot. at 10 (citing Declaration of Ing Jye Cheng ("Cheng Decl.") ¶¶ 7, 8 [Dkt. No. 29-3]). Acknowledging that the 2004 Final Rule is no longer in effect, the Secretary cites to the Allina I Administrator decision as evidence that the agency is no longer relying on the vacated 2004 Final Rule. Id.

Our Court of Appeals, in remanding Allina I to allow the agency to consider the interpretive issue anew, made it clear that it was possible the agency could and might adopt the same interpretation contained in the 2004 Final Rule. Allina I Appeal, 746 F.3d at 1111. Consequently, it follows that the fact that the agency did adopt the same interpretation as the 2004 Final Rule is not - in and of itself - indicative that the 2004 Final Rule was relied upon.

While it may have been far better if the agency had provided an explanation of its interpretation of the DSH statute along with the 2012 DSH Calculations, particularly in light of the vacatur of the 2004 Final Rule, there is no convincing evidence that Defendant actually relied on the vacated rule in promulgating the 2012 DSH Calculations. Indeed, as the Court later concludes, the Secretary appropriately relied on and interpreted the underlying DSH statute to calculate the 2012 DSH Calculations.

### B.    Notice and Comment Rulemaking Was Not Required

### i.    The APA

The parties agree that the Secretary did not undertake notice and comment rulemaking to implement a rule including Part C days in the Medicare fraction that is applicable to the 2012 DSH Calculations. The issue is whether the Secretary should have.

The APA requires notice and comment when agencies implement new legislative rules. 5 U.S.C. § 553(b). Plaintiffs argue that the 2012 DSH Calculations were not a one-time decision, but instead were the beginning of an ongoing pattern and therefore should be considered a legislative rule. Pls.' Reply at 23. Plaintiffs reason that the 2012 DSH Calculations "'reflect' a universal policy of treating part C days as part A days for all hospitals," because the agency has continued to include Part C days in the Medicare fraction in all future actions. Id. Therefore, Plaintiffs continue, the 2012 DSH Calculations constitute "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," and are therefore a "rule" for purposes of the APA Id. (citing 5 U.S.C. § 551(4)).

Defendant takes issue with the characterization of the 2012 DSH Calculations as involving a rule at all. The 2012 DSH

Calculations are comprised solely of a spreadsheet of percentages,[2] which Defendant characterizes as "preliminary, provider-specific determinations calculated on the basis of services that had already been rendered." In other words, Defendant argues that the 2012 DSH Calculations are more appropriately viewed as a step in an adjudication rather than as a rule. Def.'s Mot. at 12.

However, Defendant acknowledges that the fractions "do reflect an interpretation of the statute that Part C days are included in the Medicare fraction." Id. (emphasis in original). The 2012 DSH Calculations were not merely a step in an adjudication, but reflect a decision by the agency to include Part C days in the Medicare fraction. Thus, the 2012 DSH Calculations are not appropriately viewed as a step in an adjudication but rather as a rule.

The Court must now determine whether the agency was announcing a new legislative rule or simply interpreting the statute and announcing an interpretive rule. A "legislative rule," is a rule intended to have and does have the force of law. "A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute. When Congress delegates rulemaking authority to an agency, and the agency adopts

---

[2] The 2012 DSH Calculations are available at http://www.cms.gov/Medicare/Medicare-Fee-For-Service-Payment/AcuteInpatientPPS/Downloads/FY-2012-SSI-Ratios-for-web-posting.zip.

legislative rules, the agency stands in the place of Congress and makes law. An 'interpretative' rule, by contrast, does not contain new substance of its own but merely expresses the agency's understanding of a congressional statute." <u>Nat'l Latino Media Coal. v. F.C.C.</u>, 816 F.2d 785, 787–88 (D.C. Cir. 1987).

Factors to consider when determining whether a rule has a "legal effect" include "asking 1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule." <u>Am. Min. Cong. v. Mine Safety & Health Admin.</u>, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

The answer to all of the above questions is "no." As our Court of Appeals has previously recognized, the DSH statute is ambiguous and could be interpreted to include or exclude Part C days. <u>Ne. Hosp.</u>, 657 F.3d at 5–6. The fact that the statute could be interpreted to include Part C days indicates that there is an adequate legislative basis for the agency's decision. The rule of including Part C days in the Medicare fraction, as applied to the

18

2012 DSH Calculations, was not published in the Code of Federal Regulations, nor did the agency explicitly invoke its legislative authority. Lastly, the rule does not amend a prior legislative rule.[3]

For these reasons, the Court concludes that the agency did not issue a legislative rule when it issued the 2012 DSH Calculations, and therefore APA notice and comment were not necessary. Instead, the 2012 DSH Calculations constitute the agency's interpretation of the disproportionate patient percentage statute. The statute itself provides an "adequate legislative basis" for including Part C days in the Medicare fraction, and therefore the rule underlying the 2012 DSH Calculations is interpretive. See Am. Min. Cong., 995 F.2d at 1112.

Plaintiffs argue that, because the agency previously promulgated the same interpretation through notice and comment rulemaking in the 2004 Final Rule and the 2013 Rulemaking, it should continue to do so for the 2012 DSH Calculations. Pls.' Reply at 28-30. However, there is no requirement that the agency continue to do so. For example, an agency may choose to invoke its general

---

[3] Plaintiffs argue that the agency had a prior policy, rather than simply a practice, of excluding Part C days. See Pls.' Opp'n at 7-8. The facts do not support a finding of a policy, rather than simply a practice. Even if the agency did have a prior policy, it would not have been a legislative policy requiring notice and comment to change it.

legislating authority out of an abundance of caution. <u>Am. Min.</u>
<u>Cong.</u>, 995 F.2d at 1110-11. Therefore, the agency's prior
invocation of its general legislating authority (here, the 2004
Final Rule), is not <u>per se</u> evidence that it needed to do so and
does not negate the Court's finding that the agency's action was
interpretive.

### ii. The Medicare Statute

The Medicare statute also requires notice and comment prior
to the Secretary issuing final regulations. <u>See</u> 42 U.S.C.
§ 1395hh(b). Plaintiffs argue that the Medicare statute requires
"rulemaking for a more expansive set of agency pronouncements than
the APA." Pls.' Reply at 11. Plaintiffs cite to no cases in support
of their argument and the Court finds their statutory
interpretation arguments unpersuasive. Pls. Reply at 11-13.

Our Court of Appeals has not decided whether the Medicare
statute "creates a more stringent obligation [than the APA] or
whether it somehow changes the dividing line between legislative
and interpretive rules." <u>Monmouth Med. Ctr. v. Thompson</u>, 257 F.3d
807, 814 (D.C. Cir. 2001). However, the Court of Appeals did note
that, because the Medicare statute was adopted after the APA, it
was fair to infer that "§ 1385hh(c)'s reference to 'interpretive
rules' without any further definition adopted an exemption [to
notice and comment requirements] at least similar in scope to that
of the APA." <u>Id.</u> (internal citation omitted). Other circuit courts

have similarly concluded, though without thorough analysis, that the standards imposed by the APA and Medicare are not materially different. See Baptist Health v. Thompson, 458 F.3d 768, 776 (8th Cir. 2006) (42 U.S.C. § 1395hh(a)(2) "imposes no standards greater than those established by the APA."); Erringer v. Thompson, 371 F.3d 625, 633 (9th Cir. 2004) (declining to determine whether the Medicare Act "draws the line between substantive and interpretive rules in a different place than the APA"); Warder v. Shalala, 149 F. 3d 73, 79 n.4 (1st Cir. 1998) ("the [Medicare statute's] language, drafted after the APA's, can fairly be read to duplicate the APA on this score.").

Even if the Medicare statute was more demanding, the Secretary's interpretation of the DSH statute is not a "rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard" such that notice and comment would be required. See 42 U.S.C. § 1395hh(a)(2). As discussed previously, in the absence of any regulation or rule, there is an "adequate legislative basis" for the Secretary's interpretation and application of the statute. American Mining Congress, 995 F.2d at 1112. The agency's interpretation of the statute does not require rulemaking under the Medicare statute.

### iii. Rulemaking Through Adjudication

Defendant argues that notice and comment rulemaking is not necessary because it is "well-established that an agency may employ

a new interpretation in the course of an individual adjudication." Def.'s Mot. at 12 (citing Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 97 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication. The Secretary's mode of determining benefits by both rulemaking and adjudication is, in our view, a proper exercise of her statutory mandate" (internal citations omitted))); see also Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc) ("[W]hen as an incident of adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it."). Defendant also points out that the decision whether to make new policy through adjudication or rulemaking is generally within the agency's discretion. Id. at 13 (citing NLRB v. Bell Aerospace Co. Div. of Textron, 416 U.S. 267, 291-94 (1974)). Given this authority, Defendant concludes that it was "well within CMS's discretion to employ the interpretation it did in the course of calculating the 2012 [DHS Calculations]." Id.

Whether or not Defendant can issue new interpretations through adjudication is not relevant to this case, because the agency did not engage in an adjudication to reach the 2012 DSH Calculations. Defendant attempts to rely on a 2007 adjudication as authority for its policy in the 2012 DSH Calculations, but this reliance is misplaced. Def.'s Mot. at 14 (citing St. Joseph's Hosp.

v. Blue Cross/Blue Shield Ass'n, 2007 WL 4861952 at *5 (Nov. 13, 2007)). St. Joseph's was not a forward looking policy and was limited to fiscal years 1998, 1999, and 2000. St. Joseph's Hosp., 2007 WL 4861952 at *1. In addition, the PRRB reached its decision, later affirmed by the Administrator, with reference to the now vacated 2004 Final Rule, which calls into question any prospective validity St. Joseph's may have had. See PRRB Decision (Aug. 27, 2004), available at https://www.cms.gov/Regulations-and-Guidance/Review-Boards/PRRBReview/Downloads/2007d68.pdf

Therefore, an agency's ability to issue new interpretive rules through adjudication does not help Defendant's case here.

### iv.   Prior Definitive Interpretation

As discussed previously, in Perez, the Supreme Court overruled the Court of Appeals' Paralyzed Veterans doctrine, which had created a judge-made procedural requirement that an agency use notice-and-comment rulemaking whenever it changed a rule interpreting a statute, even though such notice-and-comment would not have been required when interpreting the statute in the first instance. See supra, 12. Plaintiffs acknowledge that changes to an interpretive rule are no longer subject to notice and comment under the APA, and have withdrawn that argument. See Pls.' Reply at 16 n. 10.

Even so, Plaintiffs contend that a "policy that 'works substantive changes' or makes 'major substantive legal additions'

to existing regulations requires notice and comment.' Pls.' Reply at 19 (quoting U.S. Telecom Ass'n v. FCC, 400 F.3d 29, 34-35 (D.C. Cir. 2005)). Plaintiffs argue that the 2012 DSH Calculations effected a substantive change and therefore should have undergone notice and comment procedures. Id. at 19-20. This argument misunderstands U.S. Telecom, which does not stand for the proposition that there are certain instances where interpretive rules require notice and comment. Rather, it held that new rules that affect substantive changes or amend prior legislative rules may more appropriately be considered legislative rules rather than interpretive rules. U.S. Telecom Ass'n, 400 F.3d at 34-35. The Court has already determined that the policy that was effectively announced in the 2012 DSH Calculations was an interpretive one, not legislative. See supra 19. Because the agency's action was interpretive, notice and comment was not required.

### C. The Decision to Include Part C Days Is Not Arbitrary and Capricious

Plaintiffs argue that the Secretary's decision to include Part C days in the Medicare fraction was arbitrary and capricious. See Pls.' Reply at 32. Plaintiffs' contention has two prongs: first, that the agency's "no-process determination for all hospitals" is arbitrary and capricious, and second, that the agency's decision is impermissibly inconsistent with the underlying statutory scheme. Id. at 32-33.

24

As to the first, Plaintiffs contend that the Secretary's policy determination is arbitrary and capricious because the agency has not "articulated any rationale for its choice." Pls. Reply at 33 (quoting Republican Nat'l Comm. v. FEC, 76 F.3d 400, 407 (D.C. Cir. 1996). The scope of review under the arbitrary and capricious standard is a narrow one. The Court is not to substitute its own judgment, but the "agency must examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43 (1983). The court may not supply reasoning that the agency itself has not provided. Id. at 43. However, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. (quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974)).

Defendant blames the absence of a contemporaneous explanation for its decision to include Part C days in the Medicare fraction in the 2012 DSH Calculations on the unique posture of the case. Def.'s Mot. at 25-26. Defendant explains that the agency expected further administrative proceedings in connection with the challenge and regarded the decision as non-final. Id. at 26. Even if the Defendant expected "further administrative development" before the PRRB and Administrator, id., it is not clear why the agency would not provide any contemporaneous explanation with the

25

issuance of the 2012 DSH Calculations. The agency also contends it was a one-time interpretive decision and as such, Plaintiffs are not entitled to expect an explanation of the sort that CMS would provide for a final prospective rule. Id.

Despite the lack of explanation, Defendant argues that the interpretative choice "can be readily sustained on the basis of the explanation set forth in the Administrator's decision in the Allina I remand." Id. at 27. Defendant concedes that the Court's review is ordinarily limited to the contemporaneous record developed by the agency, but argues that an exception is warranted. Id. (citing SEC v. Chenery Corp., 318 U.S. 80 (1943); Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 63-64 (2007)).

Chenery stands for the proposition that "an agency's decision must reflect the reasons for its action, and that subsequent rationalizations cannot be substituted on appeal for contemporaneous reasoned decisionmaking." Pub. Serv. Co. of Indiana v. I.C.C., 749 F.2d 753, 759 (D.C. Cir. 1984) (citing Chenery, 318 U.S. at 92-95). But Chenery is not absolute. In Global Crossing, the Supreme Court found that the FCC's initial opinion did not explain its determination, but nevertheless upheld the determination, finding that the "context and cross-referenced opinions ma[d]e the FCC's rationale obvious." Glob. Crossing Telecomms., 550 U.S. at 63 (internal citations omitted).

The Secretary argues that the instant case is akin to Global Crossing in that the Administrator's Allina I decision provides evidence of the agency's reasoning and therefore the agency's rationale is adequately explained. Def.'s Reply at 27. However, the Administrator's Decision, which was issued in December 2015, was not yet issued at the time of the 2012 DSH Calculations, which were issued in 2014. Although the 2013 Rulemaking had been issued, it is prospective only. See 78 Fed. Reg. 50,496, 50,614 (Aug. 19, 2013). In addition, unlike Global Crossing, the 2012 DSH Calculations do not include any cross-references to opinions or documents that shed light on the agency's rationale.

Defendant argues that it "'would be a waste of time to review only' the contemporaneous agency record to the 2012 DSH Calculations when the agency has subsequently issued in 2015 a 'better considered' decision upon which review may be based." Def.'s Mot. at 28 (quoting Pub. Serv. Co., 749 F.2d at 760). Public Service is easily distinguished from the case at hand, as it involved a clarifying opinion. The Commission had provided a first opinion, but then at the request of the petitioners to reopen the decision, reconsidered the record and issued a second clarifying opinion. The issue there was whether the second opinion could be considered. Such is not the case here. The Administrator's Allina I decision is precisely the type of post-hoc rationalization that

Chenery says cannot be substituted on appeal for contemporaneous, reasoned decisionmaking. Chenery, 318 U.S. at 92-95.

The dangers of post-hoc rationalizations for agency action are that the judiciary, rather than the agency, will supply the reasons underlying the action and that the "real reasons for agency action will escape judicial scrutiny altogether." Women Involved in Farm Econ. v. U.S. Dep't of Agric., 876 F.2d 994, 1000 (D.C. Cir. 1989). These concerns are not present here. Here, the agency has supplied its reasons on multiple occasions, including the Administrator's recent decision and the 2013 Rulemaking. This is also not a case where the agency's reasoning will escape judicial review given that the issue has been before the courts on multiple occasions, as demonstrated in this opinion. See infra, 29-30.

Viewing the situation in its entirety, the Court concludes that the process underlying the 2012 DSH Calculations was not arbitrary and capricious. Although the agency gave no explicit contemporaneous explanation, the concerns for post-hoc rationalization are not present. The agency had made its interpretation of the statute clear in the 2004 Final Rule, although that rule was later vacated, and the 2013 Regulation, and has also subsequently made it clear in the Administrator's decision. Although no explanation accompanied the 2012 DSH Calculations, it is not difficult to understand the agency's reasoning, there is no concern that subsequent rationalizations

are substituting contemporaneous reasoned decisionmaking, nor is there a concern that the judiciary is providing the reasons for the agency's action, rather than the agency.

Turning to Plaintiffs' second allegation that the Secretary's interpretation is inconsistent with the statute, our Court of Appeals has already held that the statutory text does not foreclose the Secretary's interpretation. Ne. Hosp. Corp., 657 F.3d at 13. In evaluating the same question of whether Part C enrollees are entitled to benefits under Part A, the Northeast Hospital court stated, at step 1 of the Chevron analysis, that "Congress ha[d] not clearly foreclosed the Secretary's interpretation that [Part C] enrollees are entitled to benefits under Part A." Id. While Northeast Hospital found that the Secretary's interpretation was not foreclosed by the statute, it did not reach the Chevron step 2 analysis to determine if the Secretary's interpretation was reasonable. See Ne. Hosp. Corp., 657 F.3d at 13. The Northeast Hospital court held that it was for the Secretary, not the Court, to determine the proper interpretation. Id. That is precisely what the Secretary has done in this instance.

In Catholic Health Initiatives v. Sebelius, the Court considered the phrase "entitled to benefits under Part A," also key to the case at hand, though not in the context of Part C days. 718 F.3d 914, 917 (2013). The Secretary argues that the Court's decision in Catholic Health is instructive here, Def.'s Mot. at 32,

as the Court deferred under Chevron step 2 to the Secretary's interpretation that "entitlement" is "simply a matter of meeting the statutory criteria, not a matter of receiving payment." Catholic Health, 718 F. 3d at 919-920.

Plaintiffs offer no meaningful distinction between the case at hand and Catholic Health. See Pls.' Reply at 30-31, 39. Although the type of days specifically at issue are different, the core dispute is the same. Defendant argues that "entitlement" refers simply to meeting the statutory requirements, Def.'s Mot at 31, while Plaintiffs argue that "entitlement" requires the ability to be paid under Part A. Pls.' Reply at 3, 39-40. The Catholic Health Court deferred to the agency's interpretation, and that deference is applicable to this case as well.

In light of our Court of Appeals' decisions in Northeast Hospital and Catholic Health, as well as the narrow standard of review, the Court concludes that the Secretary's interpretation that patients enrolled in Part C continue to be "eligible" for Part A is well within her authority and not arbitrary and capricious.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment shall be denied and Defendant's Motion for Summary

Judgment shall be granted. An Order shall accompany this Memorandum
Opinion.

August 17, 2016                    /s/ Gladys Kessler
                                   Gladys Kessler
                                   United States District Judge


**Copies to**: **attorneys on record via ECF**